

# SUPPLYTIME 2017

**TIME CHARTER PARTY FOR
OFFSHORE SUPPORT VESSELS**                    **PART I**

| | |
|---|---|
| 1. | Place and date of contract<br>**30 August 2023**<br>**Houston, TX** |

| 2. Owners/Place of business (full style address and e-mail) | 3. Charterers/Place of business (full style address and email) |
|---|---|
| **HORNBECK OFFSHORE OPERATORS, LLC**<br>**2 Avenue of the Republic**<br>**Georgetown, Guyana**<br><br>**Attention: John Cook, Executive Vice President**<br>**Phone: +1 985 727 2000**<br>**E-mail: john.cook@hornbeckoffshore.com**<br>**Cc: samuel.giberga@hornbeckoffshore.com** | **Benthic Ltd**<br>**Ferryside, Ferry Road**<br>**Norwich, NR1 1SW, U.K.**<br><br>**Attn: Justin Carpenter**<br>**Phone: + 1 713 825 5057**<br>**Email: justin.carpenter@benthic.com**<br>**CC: craig.devoe@benthic.com** |

| 4. Vessel´s name and IMO number (ANNEX A) | 5. Date of delivery (Cl. 2(a)) | 6. Cancelling date and |
|---|---|---|
| **Vessel's Name: HOS Strongline**<br>**IMO Number: 9040534** | **Between September 10 – 17, 2023**<br>**("Delivery Window").**<br><br>**Owners may deliver the Vessel to**<br>**Charterers at any point within the**<br>**Delivery Window at Owners' sole**<br>**discretion.** | time (Cl. 2(a) and (c))<br>**2 days following the delivery**<br>**date as nominated in Box 5** |

| 7. Port or place of delivery (Cl. 2(a)) | 8. Port or place redelivery/notice of redelivery (Cl. 2(d)) |
|---|---|
| **HOS Port, Port Fourchon, LA, USA** | (i) Port or place of redelivery<br>**HOS Port, Port Fourchon, LA, USA**<br>(ii) Number of days´ notice of redelivery<br>**ten (10) days** |

| 9. Period of hire (Cl. 1(a)) | 10. Extension of period of hire (optional) (Cl. 1(b)) |
|---|---|
| **110 days Firm.** | (i) Period of extension<br>**2 x 15-day options plus 2 x 10-day option and 5 x 2-day options.**<br>(ii) Advance notice for declaration of option (days)<br>**10 days' notice on a 15-day and 10-day option, and a 2 days' notice**<br>**on a 2-day option.** |

| 11. Automatic extension period to complete voyage or well (Cl. 1(c)) | 12. Mobilisation fee (Cl. 2(b)) |
|---|---|
| (i) Voyage or well (state which)<br>**Voyage**<br><br>(ii) Maximum extension period (state number of days)<br>**10 days or as mutually agreed** | (i) Lump sum<br>**Nil**<br>(ii) When due<br>**N/A** |

| 13. Early termination of charter (state amount of hire payable) (Cl. 34(a)) | 14. Number of days´ notice of early termination (Cl. 34(a)) | 15. Demobilisation fee (lump sum) (Cl. 2(e) and Cl. 34(a)) |
|---|---|---|
| (i) State yes, if applicable<br>**Yes**<br>(ii) If yes, state amount of hire payable<br>**In addition to the fulfilment of its restoration and redelivery obligations hereunder and the payment of all amounts outstanding, the Charterers shall also pay a fee equivalent to the daily Operational Rate for the remainder of the Period of hire (Box 9) and any exercised option periods.** | **5 days** | **Nil** |

| 16. Area of Operation (Cl. 6(a) and Cl.12(c)) | 17. Employment of vessel restricted to (state nature of services(s)) (Cl. 6(a)) |
|---|---|
| **Offshore Guyana** | **Time charters in support of Survey operations always within the safe capabilities and flag state restrictions of the vessel on a 24-hour per day basis 7 day a week, including on 24-hour DP operations, if required.** |

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

| 18. Specialist operations (Cl. 6(b))<br>(i) State if vessel may be used for ROV operations<br>**Yes**<br><br>(ii) State if vessel may be employed as a diving platform<br>**No** | 19. Fuel (Cl. 10)<br>(i) Quantity of fuel on delivery<br>**As per the soundings at delivery and subject to verification by each party's designated representatives.**<br>(ii) Payment method for fuel (state 10(c)(i) or (ii))<br>**10(c)(ii)**<br>(iii) Pre-agreed price of fuel<br>**N/A**<br>(iv) Fuel specifications and grades for fuel supplied by Charterers<br>**MGO** |
|---|---|
| 20. Charter hire (Cl. 12(a), (d), (e) and Cl. 33(e))<br>(i) State rate and currency<br>**Operational rate:** ███████████<br>(ii) Exchange rate<br>**N/A** | 21. Extension hire (if agreed, state rate) (Cl 12(b))<br>**As per Box 20** |
| 22. Invoicing for hire and other payments (Cl 12(d))<br>(i) State whether to be issued in advance or arrears<br>**Arrears**<br>(ii) State by whom to be issued if other than the party stated in Box 2<br>**As per Box 2**<br>(iii) State to whom to be issued if addressee other than stated in Box 3<br>**Same as Box 3 and accounts@benthic.com** | 23. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl 12(e))<br>**In accordance with Owners' invoice** |

| 24. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 12(e))<br>**Hire: 60 days from invoice receipt** | 25. Interest rate payable (Cl. 12(e))<br>████████ | 26. Maximum audit period (Cl. 12(g))<br>**5 years from the end of the Charter Party.** |
|---|---|---|

| 27. Meals (state rate agreed) (Cl. 6(d)(i))<br>████████ | 28. Accommodation (state rate agreed) (Cl. 6(d)(i))<br>**Included in Box 27 rate** | 29. Sublet (state amount of daily increment of charter hire) (Cl. 20)<br>**No assignment allowed without consent of Owners.** |
|---|---|---|

30. War cancellation (indicate countries agreed) (Cl. 23)
**Guyana, Trinidad, Suriname**

31. Taxes (payable by Owners) (Cl. 32)
**Owners shall be responsible for the taxes imposed by the Vessel's flag state and income taxes applicable to the Area of Operations. Charterers shall be responsible for all other taxes**

32. Off-hire (state period) (Cl. 34(d))
(i) Single consecutive
 **7 days**
(ii) Combined
 **15 days**

33. Dispute resolution (state (a), (b), (c) or (d) of Cl. 37, as agreed; if (c) agreed also state whether Singapore or English law to apply; if (d) agreed also state the place of the law governing the Charter Party and place of arbitration) (Cl. **37 b**

34. Numbers of additional clauses covering special provisions, if agreed
**43 - 57**

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

It is mutually agreed that this Charter Party shall be performed subject to the conditions contained in the Charter Party consisting of PART l, including additional clauses, if any agreed and stated in Box 34, and PART ll as well as ANNEX A, ANNEX B and ANNEX C, and any other annexes attached. In the event of a conflict of conditions, the provisions of PART l shall prevail over those of PART ll and ANNEX A, ANNEX B, and any other annexes attached to the extent of such conflict but no further. The provisions of ANNEX "C" shall prevail over Part II to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
| --- | --- |
|  |  |

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

Definitions

"Affiliates" means a company, partnership, or other legal entity which directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, a party. For the purposes of this definition, the term "control" means the direct or indirect ownership of fifty per cent (50%) or more of the issued share capital or any kind of voting rights in a company, partnership, or legal entity, or the ability to appoint a majority of the board of directors or otherwise exercise de facto control and "controls", "controlled" and "under common control" shall be construed accordingly.

"Banking Days" means days on which banks are open in the places stated in Box 2 and Box 3.

"Charterers" means the party stated in Box 3.

"Charterers' Group"  means any of the following:

(i)      Charterers and Charterers' clients (of any tier); and

(ii)     co-venturers of any of the foregoing; and

(iii)    Affiliates of any of the foregoing ; and

(iv)    contractors and sub-contractors (of any tier) and their Affiliates of any of the foregoing; and

(v)     Employees of any of the foregoing;

        but always related to the work or project on which the Vessel is employed.

"Crew" means the Master, officers, ratings and any other personnel on board the Vessel and in each case provided by the Owners.

"Employees" means employees, directors, officers, servants, agents or invitees.

"End Client" shall mean Esso Exploration and Production Guyana Limited

"Offshore Units" means any vessel, offshore installation, structure and/or mobile offshore unit used in offshore operations.

"Owners" means the party stated in Box 2.

"Owners' Group" means:

(i)      Owners; and

(ii)     Owners' Affiliates; and

(iii)    contractors and sub-contractors (of any tier) and their Affiliates of any of the foregoing; and

(iv)    Employees of any of the foregoing

        but always related to the work or project on which the Vessel is

        employed."Parties" means the Owners and the Charterers.

"Vessel" means the vessel named in Box 4 and with particulars stated in ANNEX A.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

**1.    Charter Period**

(a)    The Owners let and the Charterers hire the Vessel for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers.

(b)    Subject to Subclause 12(b) (Hire and Payments – Extension of Hire), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(i), but such an option must be declared in accordance with Box 10(ii).

(c)    The Charter Period shall automatically be extended for the time required to complete the voyage or the drilling, testing, completing and/or abandoning of the single borehole including any side-track thereof ("Well") (whichever is stated in Box 11(i)) in progress, such time shall not exceed the period stated in Box 11(ii). The Charterers shall not instruct the Vessel to commence a voyage or Well unless they reasonably expect it to be completed within the Charter Period including the time required for transit to the port or place of redelivery and demobilisation.

**2.    Delivery and Redelivery**

(a)    Delivery - (i) The Vessel shall be delivered to the Charterers between the dates stated in Box 5 and Box 6 at the port or place specified in Box 7.

(ii) Subject to Subclause 2(b) (Delivery and Redelivery – Mobilisation), the Vessel shall be delivered to the Charterers free of all cargoes and with her cargo tanks clean to applicable industry standards. The port or place of delivery shall be such that the Vessel will always lie safely afloat.

(b)    Mobilisation – The Charterers shall pay the lump sum mobilisation fee, without discount, as stated in Box 12 upon the delivery of the Vessel.

(c)    Cancelling – If the Vessel is not delivered by the cancelling date and time stated in Box 6, the Charterers shall be entitled to cancel this Charter Party. However, if the Owners know or ought reasonably to know that they will be unable to deliver the Vessel by the cancelling date, they shall give notice in writing to the Charterers thereof as soon as reasonably practicable stating in such notice the date and time by which they will be able to deliver the Vessel. The Charterers may within ~~twenty-four (24)~~ forty-eight (48) hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party. If the Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party ~~or accept late delivery~~, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party ~~terminate on terms that neither~~.

(d)    Redelivery – The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party to the Vessel's delivered condition free of cargo and with cargo tanks clean to applicable industry standards at the port or place as stated in Box 8(i) or such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days' notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii).

(e)    Demobilisation – Except in the event of termination due to the Owners' repudiatory breach, force majeure or Owner's bankruptcy as defined in clause 34(b)(iii), the Charterers shall pay the lump sum demobilisation fee without discount in the amount as stated in Box 15 which amount shall be paid on the expiration or on earlier termination of this Charter Party.

(f)    Cargo and services – Should the Owners agree to the Vessel loading and transporting cargo and/or property and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum fee agreed in respect thereof shall be payable and earned on loading or commencement of the service as the case may be, the Vessel and/or cargo and/or property lost or not lost.

**3.    Condition of Vessel**

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(a) At the date of delivery the Vessel shall be of the description and class as specified in ANNEX A, attached hereto, and in a thoroughly efficient state of hull and machinery, and fit to operate in the employment intended by the Charterers.

(b) The Owners shall exercise due diligence to maintain the Vessel in good running order, properly equipped and manned (with fully licensed Master and crew), in seaworthy condition, in such class and in every way fit for the service stated in Clause 6 (Employment and Area of Operation) throughout the period of this Charter Party. The Vessel shall have on board at all times, all current certificates, documents and equipment required to comply with Class and Flag State to enable her to perform the Charter Party without delay. Owners shall permit End Client to examine the original of any such certificates.

**4.    Structural Alterations and Additional Equipment**

The Charterers shall have the option, at their expense, of making structural alterations to the Vessel or installing additional equipment, both requiring the written consent of the Owners, which shall not be unreasonably withheld. Unless otherwise agreed, the Vessel is to be redelivered reinstated and all additional equipment removed, at the Charterers' expense, to her condition on delivery, fair wear and tear excepted. The Vessel is to remain on hire during any period of these alterations or reinstatement. The Charterers shall at all times during the term of this Charter Party be responsible for repair and maintenance of any such alteration or additional equipment. However, the Owners may, upon giving notice, undertake any such repair and maintenance at the Charterers' expense, when necessary for the safe and efficient performance of the Vessel. The equipment installed by the Charterers shall not become the property of the Owners. Notwithstanding the foregoing, if Charterers request Owners to perform any modifications on Charterers' behalf, the scope of any such modifications shall be agreed to in writing by Owners and the cost of such work shall be to Charterers' account at Owners' cost plus 10%.

**5.    Surveys, Audits and Inspections**

(a) Surveys – Upon delivery and redelivery of the Vessel, the Parties shall ~~jointly~~ appoint an independent surveyor for the purposes of determining and recording in writing:

(i) the type and quantity of fuel;

(ii) the quantity of potable water remaining onboard; and

(iii) the cleanliness and condition of the cargo tanks, as at the time of the Vessel's delivery and redelivery respectively.

The Parties shall jointly share the time and expenses of such surveys.

(b) Audits and inspections – Prior to delivery the Owners shall provide the Charterers with such information and documentation as the Charterers may reasonably require to conduct a vessel audit, survey or inspection, upon reasonable notice.

Provided that audits, assessments, surveys or inspections can be accomplished without hindrance to the working or operation of or delay to the Vessel, and subject to prior consent, which shall not be unreasonably withheld, the Owners shall provide full access to the Vessel prior to delivery for the Charterers or their appointed auditor to carry out vessel audits, assessments, surveys and inspections.

The Charterers shall have the right at any time during the Charter Period, subject to reasonable prior notice, to conduct, or have conducted, any audits, assessments, surveys or inspections of the Vessel.

The cost for all such audits, assessments, surveys and inspections shall be for the Charterers' account.

The Owners and the Crew shall assist the Charterers with the audits, assessments, surveys and inspections.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

The results, conclusions and any recommendations arising from such audits, assessments, surveys and inspections shall be presented to the Owners for review and reasonable time to comment prior to inclusion on OVID, CMID or similar systems.

6.   **Employment and Area of Operation**

(a)   Employment – The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 17, and to voyages between any good and safe port or place and any place or Offshore Units where the Vessel can safely lie always afloat within the area of operation as stated in Box 16 (Area of Operation), which shall always be within International Navigation Limits. The Charterers do not warrant the safety of any such port or place or Offshore Units but shall exercise due diligence in issuing their orders to the Vessel and having regard to her capabilities and the nature of her employment.

(b)   ROV operations and diving platform – Unless otherwise stated in Box 18(i), the Charterers shall not have the right to use the Vessel for ROV operations. Unless otherwise stated in Box 18(ii), the Vessel shall not be employed as a diving platform.

(c)   Permission and licences – Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall make reasonable efforts to assist the Charterers in securing such permission and licences. Where necessary the Charterers shall assist the Owners in obtaining work permits and visas for the Crew to work in the Area of Operation.

(d)   The Vessel's space – All the Vessel's tanks, decks, and usual places of loading and accommodation throughout the Charter Period shall be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space and certification is available and for their purposes in connection with their operations:

(i) Persons other than Crew, other than fare paying, and for such purposes to make use of the Vessel's available accommodation (as per ANNEX A). The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 27 per meal and at the rate as stated in Box 28 per day for the provision of bedding and services for persons using available accommodation.

(ii) Lawful cargo whether carried on or under deck.

(iii) Explosives, dangerous goods, and toxic and/or noxious substances whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other applicable regulations.

(e)   Charterers acknowledge they may be subject to local content obligations with respect to its activities in Guyana. Charterers further acknowledge that any local content requirements, including but not limited to the preparation of local content plans and the delivery of any and all information that may be requested by local authorities to verify the local content with respect to its activities, shall be the responsibility of Charterers.  Owners agree to provide reasonable assistance to Charterers relating to the provision of supporting documentation for Charterers' local content obligations.  Charterers shall indemnify, defend, and hold harmless Owners for any claims, liabilities, fines and penalties that might arise out of or relate to local content obligations in Guyana.

7.   **Master and Crew**

(a)   The Crew shall carry out their duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligation on the Charterers to pay to the Owners or the Crew any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Vessel and Crew shall keep full and correct records accessible to the Charterers or their agents.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(b)    (i) No bills of lading shall be issued for shipments under this Charter Party.

(ii) The Master shall sign cargo documents as directed by the Charterers in the form of receipts that are non-negotiable documents and which are clearly marked as such.

(iii) The Charterers shall indemnify the Owners against all liabilities that may arise from the signing of such cargo documents in accordance with the directions of the Charterers to the extent that the terms of such cargo documents impose more onerous liabilities than those assumed by the Owners under the terms of this Charter Party.

(c)    The Crew, if required by the Charterers, will connect and disconnect electric cables and cargo hoses when placed on board the Vessel in port as well as alongside the Offshore Units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook pre-slung cargo on board the Vessel when loading or discharging alongside Offshore Units. If any of this work is not permitted by the port regulations or the seamen and/or labour unions, the Charterers shall make, at their own expense, whatever other arrangements may be necessary.

(d)    If the Charterers have reason to be dissatisfied with the conduct of any member of the Crew, the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment.

(e)    The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners and the Crew. The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charter Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed.

**8.    Owners to Provide**

(a)    The Owners shall provide and pay for:

(i) all provisions, wages and all other expenses of the Crew;

(ii) all maintenance and repair of the Vessel's hull, machinery and equipment; and

(iii) except as otherwise provided in this Charter Party:

(1)    all insurance on the Vessel;

(2)    all dues and charges directly related to the Vessel's flag and/or registration;

(3)    all deck, cabin and engine room stores, ~~lubricants,~~ ropes and wires required for ordinary ship's purposes and for mooring alongside in harbour; and

(4)    all fumigation expenses and sanitation certificates.

The Owners' obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners are to provide and/or pay for. The Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability.

(b)    On delivery the Vessel shall be equipped at the Owners' expense with any towing and anchor handling equipment specified in ANNEX A.

(c)    Owners warrants and agree to provide at its expense sufficient experienced and certified personnel, machinery

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**
and equipment to support operations for 24 hour/7 day a week as described in Box 17.

**9.    Charterers to Provide**

(a)    While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants and water, garbage disposal, waste oil disposal, dispersants and firefighting foam, and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the Owners' business), light dues, tug assistance, canal, safe berths, dockage, harbour, wharfage, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, costs for quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise). Any items or services procured by Owners on Charterers behalf shall be reimbursed by Charterers at Owners' cost plus a 10% handling fee.

(b)    The Charterers shall provide and pay for the loading, back-loading and discharging of cargoes when not done by the Crew, the cleaning of cargo tanks, the discharging and disposal of waste products deriving from their operations, all necessary pad eyes, shackles, wires, chains, bottle-screws, load-binders and other similar items required for securing any special, exceptional, unusual or heavy lift deck cargoes, except as provided by the Owners, all ropes, slings, wires, stops, cargo hoses, spreaders and special runners actually used for loading, back-loading and discharging cargoes. Any and all cargo loading, securing, back-loading and discharging equipment shall always have been properly tested and certified as applicable regulations require.

(c)    Upon entering into this Charter Party or in any event no later than the time of delivery of the Vessel the Charterers shall provide the Owners with copies of any operational plans or documents which are necessary for the safe and efficient operation of the Vessel. All documents received by the Owners shall be returned to the Charterers on redelivery.

(d)    The Charterers shall pay for customs duties, all permits, local content plans and costs of compliance, import/export duties (including costs involved in establishing temporary or permanent importation bonds), and clearance expenses, for the Vessel and/or Charterer's equipment, required for or arising out of this Charter Party. The Vessel will remain on full Operational rate  while awaiting importation, clearance, navigation permit or equivalent, exportation and vessel inspection.

Charterers shall be responsible for obtaining any permits, administrative waivers, or government permissions to perform Charterers' intended services, including but not limited to transportation of personnel. Charterers shall reimburse Owners for those local costs associated with and including but not limited to permits, crew VISA costs, any local crew differential cost, costs for any temporary importation bond, customs duties and any and all similar cabotage or tax/fee-related costs howsoever imposed on the ship, its owners, managers or crew or arising out of this charter party at cost plus 10%.

(e)    The Charterers shall pay for any replacement of any anchor handling/towing/lifting wires and accessories which have been placed on board by the Owners or the Charterers, should such equipment be lost or damaged, other than as a result of the Owners' negligence.

(f)    The Charterers shall pay for any fines, taxes or imposts levied and provide any financial security required in the event that contraband and/or unmanifested drugs and/or cargoes are found to have been shipped as part of the cargo. The Vessel shall remain on hire during any time lost as a result therof. However, if the Crew are involved in smuggling, any financial security, fines, taxes or imposts required and any fines, taxes or imposts shall be provided and paid for by the Owners and the Vessel shall be off hire during any time lost as a result thereof.

(g)    The Charterers shall pay for, or reimburse Owners at its cost plus 10%, for any regulatory (e.g. class society) reviews required as a result of modifications onboard the Vessel.

**10.    Fuel**

(a)    Upon delivery – The Vessel shall be delivered with no less fuel on board than the quantity stated in Box 19(i).

(b)    Upon redelivery – The Vessel shall be redelivered with no less fuel on board than the quantity required by the

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

Vessel to reach, at economical speed, the nearest port where fuel of the specification and grade as stated in Box 19(iv) is available.

(c)     Payment for fuel – The payment, crediting and accounting of fuel remaining on board the Vessel at the time of delivery and redelivery of the Vessel shall be either in accordance with Subclause 10(c)(i) or 10(c)(ii) below, as indicated in Box 19(ii). If Box 19(ii) is left blank, Subclause 10(c)(i) shall apply.

(i) The Charterers shall purchase and pay the Owners for all the fuel on board at the time of delivery at the substantiated price paid by the Owners at the last loading of fuel and the Owners shall purchase and credit the Charterers for all the fuel on board at the time of redelivery at the substantiated price paid by the Charterers at the last loading of fuel. The quantities of fuel shall be those recorded on the Vessel's delivery and redelivery surveys (see Clause 5 (Surveys, Audits and Inspections)); or

(ii) The Charterers shall pay the Owners, or the Owners shall credit the Charterers, for the difference in the quantity of fuel on board between the delivery and redelivery of the Vessel by reference to the delivery and redelivery surveys (see Clause 5 (Surveys, Audits and Inspections). In the event that the price paid by the Charterers for the quantity of fuel consumed, or credited by the Owners for fuel loaded, is a pre-agreed price, this shall be the price stated in Box 19(iii). Where the price of fuel is not pre-agreed, Box 19(iii) shall be left blank and the price shall be the substantiated price paid for the Vessel's last loading of fuel.

(d)     Loading of fuel – The Charterers shall supply fuel of the specifications and grades as stated in Box 19(iv). The fuels shall be of a stable and homogenous nature and unless otherwise agreed in writing, shall comply withthe latest edition of ISO Standard 8217 as well as with the relevant provisions of MARPOL. The Chief Engineer shall co-operate with the Charterers' bunkering agents and fuel suppliers and comply with their requirements relating to the fuel, including but not limited to, checking, verifying and acknowledging sampling, reading or sounding and metering, before, during and after the loading of fuel. During delivery representative samples of all fuels shall be taken at a point as close as possible to the Vessel's fuel manifold. Each of the samples shall be divided into a minimum of four (4) sub-samples, labelled and sealed and signed by the suppliers, Chief Engineer and the Charterers or their agents. One sub-sample shall be retained on board for MARPOL purposes and the remaining samples distributed between the Owners, the Charterers and the suppliers. If any claim should arise in respect of the quality or specification or grades of the fuel supplied, the samples of the fuel retained as aforesaid shall be analysed by a qualified and independent laboratory, jointly appointed by the Parties, whose analysis as regards the characteristics of the fuel shall be binding on the Parties concerning the characteristics tested for. If one or more of the fuel samples are found not to be in compliance with the specification as agreed in the paragraph above the Charterers shall meet the cost of this analysis, otherwise the same shall be for the Owners' account.

(e)     Compliance - The Vessel's Chief Engineer, or nominee, may at any time before or during the loading of any fuel, stop the loading if such person reasonably believes that it does not comply with Subclause 10(d) until such time as the Owners or the fuel supplier have reasonably demonstrated their compliance with Subclause 10(d). The Vessel shall remain on hire during any stoppage of loading under this Clause.

(f)     The Owners shall not be held liable for any reduction in the Vessel's speed, performance and/or increased fuel consumption nor for any time lost arising as a result of any fuel not complying with Subclause 10(d) and the Vessel shall remain on hire.

**11.     BIMCO ISPS/MTSA Clause for Time Charter Parties 2005**

(a)     (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

the full style contact details of the Company Security Officer (CSO).

(iii) Except as otherwise provided in this Charter Party, loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account.

(b)    (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision: "The Charterers shall provide the Owners with their full style contact details and, where sub- letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## 12.    Hire and Payments

(a)    Hire – The Charterers shall pay hire due for the Vessel at the rate stated in Box 20(i) per day or pro rata for part thereof from the time that the Vessel is delivered to the Charterers until the expiration or earlier termination of this Charter Party. Notwithstanding the foregoing or any other term of this Charter Party, should the Vessel be prevented from working as a result of COVID-19 (or by relevant authorities' action, reaction or measure to COVID-19) as mutually agreed between the Owners and the Charterers, the Charterers shall pay hire due for the Vessel at the Operational rate stated in Box 20(i) for the duration the Vessel is prevented from working due to COVID19, but not exceeding the number of days stated in Box 9. Notwithstanding the foregoing, in the event the COVID-19 infection is caused by the Owners or one of their crew members, the Vessel shall remain on hire for up to forty-eight (48) hours to allow Owners to resolve the situation. If after seven (7) days the situation has not been remedied, then the Charter hire shall be suspended until such time as the Vessel resumes services. Victualling, VSAT, fuel, port costs and other third-party costs will remain unchanged and for the Charterers' account. "COVID– 19" shall mean: the severe acute respiratory syndrome coronavirus 2 (SARS-CoV- 2) and the resulting coronavirus disease, known as COVID-19.

(b)    Extension hire – If the option to extend the Charter Period under Subclause 1(b) (Charter Period) is exercised, the hire for such extension shall, unless stated in Box 21, be agreed between the Parties. Should the Parties fail to reach an agreement, then the Charterers shall not have the option to extend the Charter Period.

(c)    Adjustment of hire – The hire shall be adjusted to reflect documented changes, after the date of entering into the Charter Party, in the Owners' costs arising from changes in Owners' crew labor costs (resulting from government and/or union wage increases)Owners' labor or insurance costs, changes in laws and regulations, or the implementation thereof, within the Area of Operation stated in Box 16 governing the Vessel, its Owners and/or its Crew or this Charter Party or in the application thereof.

(d)    Invoicing – All invoices shall be issued in the contract currency stated in Box 20(i). In respect of reimbursable expenses incurred in currencies other than the contract currency, the rate of exchange into the contract currency shall be stated in Box 20(ii). Invoices covering hire and any other payments due shall be issued monthly as stated in Box 22(i) and at the expiration or earlier termination of this Charter Party. If Subclause 10(c)(i) (Fuel – Payment

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

for Fuel) applies, fuel on board at delivery shall be invoiced at the time of delivery.

(e)     Payments – Payments of hire, fuel invoices and disbursements for the Charterers' account shall be received within the number of days stated in Box 24 from the date of receipt of the invoice. Payment shall be received in the currency stated in Box 20(i) in full without discount or set-off to the account stated in Box 23. However, any advances for disbursements made on behalf of and approved by the Owners may be deducted from hire due. If valid and undisputed payment is not received by the Owners within five (5) Banking Days following the due date the Owners are entitled to charge interest at the rate stated in Box 25 on the amount outstanding from and including the due date until payment is received.

If the Charterers reasonably believe an incorrect invoice has been issued, they shall notify the Owners promptly, but in no event later than the due date, specifying the reason for disputing the invoice. The Charterers shall pay the undisputed portion of the invoice but shall be entitled to withhold payment of the disputed amount. The Owners shall be entitled to charge interest at the rate stated in Box 25 on such disputed amounts where resolved in favour of the Owners. The balance payment (together with any applicable interest) shall be received by the Owners within five (5) Banking Days after the dispute is resolved. Should the Charterers' claim be valid, a corrected invoice shall be issued by the Owners.

(f)     Suspension and termination - (i) Where there is a failure to make punctual payment of hire or other sums due and payable by the Charterers to Owners, the Owners shall promptly notify the Charterers in writing of such failure and require payment within five (5) days.

(ii) At any time while hire or other sums due and payable by the Charterers to Owners remain outstanding the Owners shall be entitled to suspend the performance of any or all of their obligations under this Charter Party until such time as all the hire and/or other sums due to the Owners under the Charter Party has been received by the Owners. Throughout any period of suspended performance under this Clause, the Vessel shall remain on hire. The Owners' right to suspend performance under this Clause shall be without prejudice to any other rights they may have under this Charter Party.

(iii) If after ~~one (1)~~ five (5) days of the written notification referred to in Subclause 12(f)(i) the sums referred to have still not been received, the Owners may at any time while such sums remain outstanding terminate the Charter Party. The right to terminate shall be exercised promptly and in writing and is not dependent upon the Owners first exercising the right to suspend performance of their obligations under the Charter Party pursuant to Subclause 12(f)(ii) above. The receipt by the Owners of all sums due from the Charterers after the ~~one (1) day~~ five (5) day period referred to above has expired but prior to the notice of termination shall be deemed a waiver of the Owners' right to terminate the Charter Party. The Owners' right to terminate under this Clause shall be without prejudice to any other rig they may have under this Charter Party.

(iv) Where the Owners choose not to exercise any of the rights afforded to them by this Clause in respect of any particular late payment of hire, or a series of late payments of hire, or other sums due and payable by the Charterers to Owners under the Charter Party, this shall not be construed as a waiver of their right either to suspend performance under Subclause 12(f)(ii) or to terminate the Charter Party under Subclause 12(f)(iii) in respect of any subsequent late payment under this Charter Party.

(v) The Charterers shall indemnify the Owners in respect of any liabilities incurred by the Owners under cargo documents issued pursuant to Subclause 7(b) (Master and Crew) as a consequence of the Owners' proper suspension of any or all of their obligations under this Charter Party or termination of this Charter Party.

(g)     Audit – The Charterers shall have the right to appoint an independent qualified accountant to audit the Owners' books directly related to work performed under this Charter Party at any time after the conclusion of the Charter Party, up to the expiry of the period stated in Box 26, to determine the validity of the Owners' charges hereunder. The Owners undertake to make their records available for such purposes at their principal place of business during normal working hours. Any discrepancies discovered in payments made shall be promptly resolved by invoice or credit as appropriate.

**13.     Off-hire**

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(a)     Off-hire and exceptions – If as a result of any deficiency of Crew or of the Owners' stores, strike of Crew, breakdown of machinery and/or equipment (excluding any equipment installed on the Vessel by the Charterers pursuant to Clause 4 (Structural Alterations and Additional Equipment), damage to hull or other accidents to the Vessel, the Vessel is prevented from working, no hire shall be payable in respect of any time lost until the Vessel can work again and is at the same location as where the Vessel was prevented from working, and any hire paid in advance shall be adjusted accordingly provided always however that hire shall not cease in the event of the Vessel being prevented from working as aforesaid as a result of:

(i) the carriage of cargo as noted in Subclause 6(d)(iii) (Employment and Area of Operation – The Vessel's Space);

(ii) quarantine or risk of quarantine unless when caused by the Charterers requiring the Crew to have having communication with the shore or other vessel at any infected area not in connection with the employment of the Vessel, without the consent or the instructions of the Charterers;

(iii) deviation from the Vessel's Charter Party duties or exposure to abnormal risks at the request of the Charterers;

(iv) detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbours or to river or ports with bars or suffering an accident to its cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred;

(v) detention or damage by ice;

(vi) any act or omission of the Charterers' Group or due to the nature of Charterers' cargoes attached to, laden upon, or carried by the Vessel; or

(vii) any force majeure event as stated in Clause 35 (Force Majeure).

(viii) a medical evacuation of a Vessel crew member up to a maximum of forty-eight (48) hours in port;

(b)     (i) Liability for Vessel not working – The Owners' liability for any loss, damage or delay sustained by the Charterers as a result of the Vessel being prevented from working by any cause whatsoever, including negligence on the part of a member of the Owners' Group, shall be limited to suspension of hire, except as provided in Subclause 11(a)(iii) (BIMCO ISPS/MTSA Clause for Time Charter Parties), whether or not the Vessel is off- hire.

(c)     Maintenance and drydocking

(i)  Maintenance – Notwithstanding Subclauses 13(a) and 13(c)(ii), the Owners shall be entitled to twenty-four (24) hours on hire at the Operational rate per month or pro rata, which shall be cumulative, from the commencement of the charter period for the purposes of maintenance, survey, and repair and dry-docking (Maintenance Days). During any such Maintenance Days, the Charterers' obligations under Subclause 9(a) (Charterers to Provide) shall be suspended.

Using, or not using Maintenance Days shall be the Owners decision alone and they shall give the Charterers reasonable notice of their intention to use such days and how many. Hire shall not be payable for accumulated Maintenance Days not used by the Owners. However, hire for any Maintenance Days which, at the Charterers' request, have not been used shall be payable on redelivery or earlier termination of the Charter Party. However, hire for any Maintenance Days which, at the Charterers' request, have not been used shall be payable on redelivery or earlier termination of the Charter Party.

(ii) Dry docking – The Charterers shall permit the Vessel to dry dock at regular intervals in accordance with its classification society requirements. Unless on-hire by reason of accumulated Maintenance Days, the Vessel shall be off-hire from the time the Charterers place it at the Owners' disposal. The Vessel shall go back on hire from the time it is placed at the Charterers' disposal at the place where it was originally released.

Whenever a dry-docking is required, the Charterers shall beforehand remove any cargo, and clean any cargo tanks as necessary to effect such dry-docking, after which the Vessel shall be placed at the Owners' disposal. The

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

PART II
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

Vessel shall be returned to the Charterers when it has completed dry-docking and returned to the port or place where it was placed at the Owners' disposal. The Owners choice of dry-dock location shall always be reasonable as to time and cost, both to themselves and to the Charterers.

At the commencement of the charter period, the Owners shall provide the Charterers with the Vessel's class dry-docking schedule for the charter period, including any options to extend.

**14.    Liabilities and Indemnities**

(a)    Knock for knock

(i) Owners – Notwithstanding anything else contained in this Charter Party excepting Subclauses 9(e) (Charterers to Provide), 14(c) (Liabilities and Indemnities – Limitations), and 18(c) (Saving of Life and Salvage), the Charterers shall not be responsible for loss of or damage to any property of any member of the Owners' Group, including the Vessel, or for personal injury, illness or death of any member of the Owners' Group, arising out of or in any way connected with the performance or non-performance of this Charter Party whatsoever and in any circumstances, even if such loss, damage or personal injury, illness or death is caused wholly or partially by the act, negligence neglect, breach of duty (whether statutory or otherwise) or default of the Charterers' Group, and even if such loss, damage or personal injury, illness or death is caused wholly or partially by the unseaworthiness of any vessel; and the Owners shall indemnify, protect, defend and hold harmless the Charterers' Group from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, personal injury, illness or death.

(ii)    Charterers – Notwithstanding anything else contained in this Charter Party excepting Clauses 9(e) (Charterers to provide) and 16 (Wreck Removal), the Owners shall not be responsible for loss of, damage to, or any liability arising out of anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, any property of any member of the Charterers' Group, whether owned or chartered, including their Offshore Units, or for personal injury, illness or death of any member of the Charterers' Group or of anyone on board anything towed by the Vessel, arising out of or in any way connected with the performance or non-performance of this Charter Party whatsoever and in any circumstances, even if such loss, damage, liability or personal injury, illness or death is caused wholly or partially by the act, negligence neglect, breach of duty (whether statutory or otherwise) or default of the Owners' Group, and even if such loss, damage, liability or personal injury, illness or death is caused wholly or partially by the unseaworthiness of any vessel; and the Charterers shall indemnify, protect, defend and hold harmless the Owners' Group from any and against all claims, costs, expenses, actions, proceedings, suits, demands, and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury, illness or death.

(b)    Excluded losses – Notwithstanding anything else contained in this Charter Party neither party shall be liable to the other for:

(i) any loss of use (including, without limitation, loss of use or the cost of use of property, equipment, materials and services including without limitation, those provided by contractors or subcontractors of any tier or by third parties), loss of time, loss of income or profits or anticipated profits; loss of product; loss of business; business interruption; loss of or deferral of drilling rights; loss, restriction or forfeiture of licences, concession or field interest; loss of revenue, shut in, loss of production, deferral of production, increased cost of working; cost of insurance; or any other similar losses whether direct or indirect; and

(ii)    any consequential or indirect loss whatsoever; arising out of or in connection with the performance or non-performance of this Charter Party even if such loss is caused wholly or partially by the act, negligence neglect, breach of duty (whether statutory or otherwise) or default of the indemnified party, and even if such loss is caused wholly or partially by the unseaworthiness of any vessel, and the Owners shall indemnify, protect, defend and hold harmless the Charterers' Group from such losses suffered by the Owners' Group and the Charterers shall indemnify, protect, defend and hold harmless the Owners' Group from such losses suffered by the Charterers' Group.

(c)    Limitations – Nothing contained in this Charter Party shall be construed or held to deprive the Owners or the Charterers, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter Party shall create any right to limit liability. Where the Owners or the Charterers may seek an indemnity under the provisions of

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

this Charter Party or against each other in respect of a claim brought by a third party, the Owners or the Charterers shall seek to limit their liability against such third party.

(d)    Himalaya clause – All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Charterers shall also apply to and be for the benefit of the Charterers' Group and their respective underwriters.

All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Owners shall also apply to and be for the benefit of the Owners' Group and their respective underwriters; the Vessel and its registered owners; and the Crew.

The Owners or the Charterers shall be deemed to be acting as agent or trustee of and for the benefit of all such persons and parties set forth above, but only for the limited purpose of contracting for the extension of such benefits to such persons and parties.

(e)    Not used ~~All exclusions and indemnities under clauses 14 and 15, except for clause 14 (f), will apply irrespective of causes and notwithstanding the negligence, breach of contract, breach of duty of care or of strict liability or of other premises liability, unseaworthiness, unairworthiness, and breach of statutory duty of the indemnified party or any other entity or party and will apply irrespective of any claim in tort, under contract or otherwise at law.~~

(f)    <u>Owners and Charterers shall each indemnify the other from and against all claims, losses, damages, costs, expenses and liabilities in respect of personal injury including death or disease or loss of or damage to the property or any Third Parties to the extent that any such injury, loss or damage is caused by their respective negligence or breach of duty (statutory or otherwise) arising from or in relation to the performance or non-performance of this Charter Party. "Third Parties" shall mean any party not in either Owner's Group or Charterer's Group.</u>

**15.    Pollution**

(a)    Except as otherwise provided for in Subclause 18(c)(iii) (Saving of Life and Salvage), the Owners shall be liable for, and agree to indemnify, defend and hold harmless the Charterers against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities<u>, loss or damage</u> whatsoever arising out of actual or threatened pollution damage due to discharge, spills or leaks from the Vessel, except as may ~~emanate~~ <u>originate</u> from cargo <u>or Charterers' Group's property</u> thereon or therein and the cost of cleanup or control thereof even if such claims, costs expenses, actions proceedings, suits, demands, liabilities are caused wholly or partially by the act, <u>negligence</u>~~neglect~~, breach of duty (whether statutory or otherwise) or default of the Charterers' Group.

(b)    The Charterers shall be liable for and agree to indemnify, defend and hold harmless the Owners from all claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage whatsoever arising out of or resulting from any other actual or threatened pollution damage <u>due to sudden and accidental discharge, spills or leaks originating from the Charterer Group's property or equipment or caused by Charterers' coring, seismic, sampling, subsea or survey operations</u>, even if such claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage are caused wholly or partially by the act, <u>negligence</u>~~neglect~~, breach of duty (whether statutory or otherwise) or default of the Owners' Group and even if such loss, damage, or liability is caused wholly or partially by the unseaworthiness of the Vessel.

(c)    The Charterers shall, upon giving notice to the Owners or the Master, have the right (but shall not be obliged) to place on board the Vessel and/or have in attendance at the site of any pollution or threatened incident one or more Charterers' representative to observe the measures being taken by Owners and/or national or local authorities or their respective servants, agents or contractors to prevent or minimise pollution damage and to provide advice, equipment or manpower or undertake such other measures, at Charterers' risk and expense, as are permitted under applicable law and as Charterers believe are reasonably necessary to prevent or minimise such pollution damage or to remove the threat of pollution damage.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

**16.    Wreck Removal**

If the Vessel becomes a wreck and has to be removed by order of any lawful authority having jurisdiction over the area where the Vessel is placed or as a result of compulsory law~~or End Client request~~, the Owners shall be liable for any and all <u>costs and</u> expenses in connection with the lighting, marking, raising, removal, destruction of the Vessel.

**17.    Insurance**

(a)    (i) ~~The Owners~~<u>Each Party</u> shall obtain and maintain in effect for the duration of this Charter Party, with reputable insurers,the insurances set forth in ANNEX B <u>and Continued ANNEX B</u>. Policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of <u>Each Party</u>~~the Owners~~.

(ii) The <u>Parties</u>~~Charterers~~ <u>and End Client</u> shall upon request ~~from the Charterers~~ be named as co-insured <u>on each others' respective insurance policies and each shall</u>. ~~The Owners shall upon request~~ cause insurers to waive subrogation rights against the <u>other</u>~~Charterers' Group~~. Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of <u>each respective Party</u>~~the Owners~~ under the terms of this Charter Party.

(b)    ~~The Owners~~<u>Each Party</u> shall upon request furnish the ~~Charterers~~<u>other Party</u> with copies of certificates of insurance which provide sufficient information to verify that the ~~Owners have complied with the~~ insurance requirements of this Charter Party <u>have been fulfilled</u>.

(c)    If <u>either Party</u>~~the Charterers~~ takes out insurance that covers risks for which they indemnify <u>the other Party</u>~~Owners~~, the <u>Party procuring such insurance</u>~~Charterers~~ shall ensure that their underwriters waive subrogation rights against the <u>other Party</u>~~Owners Group and End Client~~, but only insofar as these relate to liabilities which are properly the responsibility ~~of the Charterers~~ under the terms of this Charter Party

(d)    <u>If either Party fails to comply with the aforesaid insurance requirements, the non-failing Party may, without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the other Party under this Charter Party, or terminate this Charter Party for Owners default.</u>

**18.    Saving of Life and Salvage**

(a)    The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers ~~and without loss of hire~~ provided however that notice of such deviation is given as soon as possible. <u>All costs, including loss of time, incurred in saving or attempting to save a life shall be borne equally by the parties, one half by Charterers and the other half by Owners.</u>

(b)    ~~Subject to the Charterers' consent, which shall not be unreasonably withheld, the~~ <u>The</u> Vessel shall ~~be at liberty to only~~ undertake attempts at salvage <u>of property owned or contracted to Charterers or End Client</u>. ~~Such undertaking shall be considered as normal operations, it being understood that the Vessel shall be off-hire from the time it leaves port or commences to deviate and it shall remain off-hire until it is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services. All salvage monies earned by the Vessel shall be divided equally between the Parties, after deducting the Crew's share, legal expenses, value of fuel consumed, hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage. The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.~~

(c)    The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers' Group <u>or End Client</u>, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Crew may have under any title. If the Owners render assistance to such property in distress on the basis of "no claim for salvage", then, notwithstanding any other provisions

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**

**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

contained in this Charter Party and even in the event of negligence~~neglect~~ or default of the Owners or Crew:

(i) The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Crew in relation to such assistance.

~~(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred.~~

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant originating from the Charterer Group's property or equipment, howsoever caused occurring within the offshore site and any pollution resulting therefrom wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or emission.

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance ~~or effecting repairs under Subclause 18(c)(ii), and time taken for such repairs shall not count against time granted under Subclause 13(c) (Off-hire – Maintenance and Drydocking)~~.

~~(v) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance.~~

**19.    Lien**

The Owners shall have a lien upon all property, cargoes, fuel and equipment~~fuel and equipment~~ owned or leased by the Charterers for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. ~~The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel.~~

Should the Vessel be arrested by reason of claims or liens arising out of its operation hereunder, unless~~unless~~ brought about by the act or ~~neglect~~ negligence of the Owners~~OwnersCharterers~~, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up security to release the Vessel. Except as provided in Clause 14 (Liabilities and Indemnities) and unless~~unless to the extent~~ brought about by the act or ~~neglect~~ negligence of the Owners~~OwnersCharterers~~, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while it is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation therof.

**20.    Sublet and Assignment**

(a)    Charterers – The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld or delayed, upon giving notice in writing to the Owners, but the original Charterers shall ~~unless this Charter Party is assigned to the End Client,~~ always remain responsible to the Owners for due performance of the Charter Party. The person or company taking such subletting, assigning or loan and their contractors and sub-contractors shall be deemed included in the Charterers' Group for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional hire shall be paid as agreed between the Charterers and the Owners in Box 29, having regard to the nature and period of any intended service of the Vessel.

(b)    Owners – The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld or delayed. Approval by the Charterers of such transfer or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

**21.    Substitute Vessel**

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide at the same rate and without any additional mobilisation or demobilisation fee, a substitute vessel of at least equivalent capability, subject to the Charterers' prior approval which shall not be unreasonably withheld or delayed.

The period of hire shall restart once the substitute vessel is delivered to the area of last operations of the non-performing Vessel and ready to recommence operations.

**22.    BIMCO War Risks Clause "CONWARTIME 2013"**

(a)     For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"); acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the government of any state or territory whether recognised or not, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or may become dangerous to the Vessel, cargo, crew or other persons on board the Vessel.

(b)     The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area"), where it appears that the Vessel, cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be exposed to War Risks whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(c)     The Vessel shall not be required to load contraband cargo, or to pass through any blockade as set out in Subclause 22(a), or to proceed to an Area where it may be subject to search and/or confiscation by a belligerent.

(d)     If the Vessel proceeds to or through an Area exposed to War Risks, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with War Risks.

(e)     All payments arising under Subclause 22(d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(f)     If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an Area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(g)     The Vessel shall have liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the Vessel sails, or other government to whose laws the Owners are subject, or any other government of any state or territory whether recognised or not, body or group whatsoever acting with the power to compel compliance with their orders or directions;

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any alternative port any cargo or part thereof which may expose the Vessel to being held liable as a contraband carrier;

(v) to call at any alternative port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment, detention or similar measures.

(h)    If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice. All costs, risk and expenses for the alternative discharge shall be for the Charterers' account.

(i)    The Charterers shall indemnify the Owners for claims arising out of the Vessel proceeding in accordance with any of the provisions of Subclauses 22(b) to (h) which are made under any bills of lading, waybills or other documents evidencing contracts of carriage.

(j)    When acting in accordance with any of the provisions of Subclauses 22(b) to (h) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**23.    War Cancellation Clause**

Either party may cancel this Charter Party on the outbreak of war (whether there be a declaration of war or not) between any two or more of the countries stated in Box 30.

**24.    BIMCO Ice Clause for Time Charter Parties**

(a)    The Vessel shall not be obliged to force ice but, subject to the Owners' prior approval having due regard to its size, construction and class, may follow ice-breakers.

(b)    The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in the Master's sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, the Master shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

(c)    Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.

(d)    Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account.

**25.    BIMCO Infectious or Contagious Diseases Clause for Time Charter Parties**

(a)    For the purposes of this Clause, the words:

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

"Disease" means a highly infectious or contagious disease that is seriously harmful to humans.

"Affected Area" means any port or place where there is a risk of exposure to the Vessel, crew or other persons on board to the Disease and/or to a risk of quarantine or other restrictions being imposed in connection with the Disease.

(b)     The Vessel shall not be obliged to proceed to or continue to or remain at any place which, in the reasonable judgement of the Master/Owners, is an Affected Area.

(c)     If the Owners decide in accordance with Subclause 25(b) that the Vessel shall not proceed or continue to an Affected Area they shall immediately notify the Charterers.

(d)     If the Vessel is at any place which the Master in the Master's reasonable judgement considers to have become an Affected Area, the Vessel may leave immediately, with or without cargo on board, after notifying the Charterers.

(e)     In the event of Subclause 25(c) or 25(d) the Charterers shall be obliged, notwithstanding any other terms of this Charter Party, to issue alternative voyage orders. If the Charterers do not issue such alternative voyage orders within forty-eight (48) hours of receipt of the Owners' notification, the Owners may discharge any cargo already on board at any port or place. The Vessel shall remain on hire throughout <u>until discharge of the cargo</u> and the Charterers shall be responsible for all additional costs, expenses and liabilities incurred in connection with such orders/delivery of cargo.

(f)     In any event, the Owners shall not be obliged to load cargo or to sign, and the Charterers shall not allow or authorise the issue on the Owners' behalf of, bills of lading, waybills or other documents evidencing contracts of carriage for any Affected Area.

(g)     The Charterers shall indemnify the Owners for any costs, expenses or liabilities incurred by the Owners, including claims from holders of bills of lading, as a consequence of the Vessel waiting for and/or complying with the alternative voyage orders.

(h)     If, notwithstanding Subclauses 25(b) to (f), the Vessel does proceed to or continue to or remain at an Affected Area:

(i) The Owners shall notify the Charterers of their decision but the Owners shall not be deemed to have waived any of their rights under this Charter Party.

(ii) The Owners shall endeavour to take such reasonable measures in relation to the Disease as may from time to time be recommended by the World Health Organisation.

(iii) Any additional costs, expenses or liabilities whatsoever arising out of the Vessel visiting or having visited an Affected Area, including but not limited to screening, cleaning, fumigating and/or quarantining the Vessel and its crew, shall be for the Charterers' account and the Vessel shall remain on hire throughout.

(i)     The Vessel shall have liberty to comply with all orders, directions, recommendations or advice of competent authorities and/or the Flag State of the Vessel in respect of arrival, routes, ports of call, destinations, discharge of cargo, delivery or in any other respect whatsoever relating to issues arising as a result of the Vessel being or having been ordered to an Affected Area.

(j)     If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, nor shall it be or give rise to an off-hire event, but shall be considered as due fulfilment of this Charter Party. ~~In the event of a conflict between the provisions of this Clause and any implied or express provision of this Charter Party, this Clause shall prevail to the extent of such conflict, but no further.~~

(k)     ~~The Charterers shall indemnify the Owners if after the currency of this Charter Party any delays, costs, expenses or liabilities whatsoever are incurred as a result of the Vessel having visited an Affected Area during the currency of this Charter Party~~.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(l)    The Charterers shall ensure that this Clause shall be incorporated into all sub-charters and bills of lading, waybills or other documents evidencing contracts of carriage issued pursuant to this Charter Party.

(m)    In the event Charterers request, or local port authorities require, the Vessel's Marine Crew be provisionally quarantined prior to boarding the Vessel (collectively the "Provisional Quarantine Crew"), all costs related to the Provisional Quarantine Crew, including their fully burdened daily wages, shall be billed from the date when the provisional quarantine commences until the date of boarding the Vessel ("Provisional Quarantine Period"). Further, all victualling, lodging, and travel accommodations for the Provisional Quarantine Crew shall be provided by the Charterer during the Provisional Quarantine Period.

**26.    Health, Safety and Environment**

The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health, safety and the environment, and such Charterers' instructions as appended hereto, provided such instructions do not conflict with the Vessel's flag state obligations. More specifically, the Owners shall comply with Charterers' and End Client's Health, Safety & Environment ("HSE") requirements and provide full cooperation in conducting vessel inspection when required by the Charterers or End Client. In the case of any HSE event or breakdown Owners' authorised representative shall immediately report (verbally) to Charterers' on-board representative and shall provide a written incident report within 24 hours from the time the event occurred. The Owners shall also provide a detailed HSE report or a breakdown report (including a root cause analysis) to Charterers' representative within 10 days.

**27.    Drugs and Alcohol Policy**

The Owners undertake that they have, and shall maintain for the duration of this Charter Party, a policy on Drugs and Alcohol Abuse applicable to the Vessel (the "D & A Policy") that meets or exceeds the standards in the OCIMF Guidelines for the Control of Drugs and Alcohol Onboard Ship 1995 (or any subsequent amendments). The Owners shall exercise due diligence to ensure that the D & A Policy is understood and complied with on and about the Vessel. An actual impairment, shall not in and of itself mean that the Owners have failed to exercise due diligence.

**28.    BIMCO Anti-Corruption Clause for Charter Parties**

(a)    The Parties agree that in connection with the performance of this Charter Party they shall each:

(i) comply at all times with all applicable anti-corruption legislation and have procedures in place that are, to the best of its knowledge and belief, designed to prevent the commission of any offence under such legislation by any member of its organisation or by any person providing services for it or on its behalf; and

(ii) make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions in connection with this Charter Party.

(b)    If a demand for payment, goods or any other thing of value ("Demand") is made to the Master or the Owners by any official, any contractor or sub-contractor engaged by or acting on behalf of Owners or Charterers or any other person not employed by Owners or Charterers and it appears that meeting such Demand would breach any applicable anti-corruption legislation, then the Master or the Owners shall notify the Charterers as soon as practicable and the Parties shall cooperate in taking reasonable steps to resist the Demand.

(c)    If, despite taking reasonable steps, the Demand is not withdrawn, the Master or the Owners may issue a letter of protest, addressed or copied to the Charterers. If the Master or the Owners issue such a letter, then, in the absence of clear evidence to the contrary, it shall be deemed that any delay to the Vessel is the result of resisting the Demand and (as applicable):

(i) the Vessel shall remain on hire; or

(ii) any time lost as a result thereof shall count as laytime or (if the Vessel is already on demurrage) as time on demurrage.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(d)    If either party fails to comply with any applicable anti-corruption legislation it shall defend and indemnify the other party against any fine, penalty, liability, loss or damage and for any related costs (including, without limitation, court costs and legal fees) arising from such breach.

(e)    Without prejudice to any of its other rights under this Charter Party, either party may terminate this Charter Party without incurring any liability to the other party if:

   (i) at any time the other party or any member of its organisation has committed a breach of any applicable anti-corruption legislation in connection with this Charter Party; and

   (ii) such breach causes the non-breaching party to be in breach of any applicable anti-corruption legislation.

   Any such right to terminate must be exercised without undue delay.

(f)    Each party represents and warrants that in connection with the negotiation of this Charter Party neither it nor any member of its organisation has committed any breach of applicable anti-corruption legislation. Breach of this Subclause 28(f) shall entitle the other party to terminate the Charter Party without incurring any liability to the other.

### 29.    MLC 2006

   For the purposes of this Clause:

   "MLC" means the International Labour Organization (ILO) Maritime Labour Convention (MLC 2006) and any amendment thereto or substitution thereof.

   "Charterers' Personnel" shall mean any Employees of each of the Charterers' Group who are on board the Vessel.

(a)    If applicable, the Owners shall provide the Charterers with a copy of Part I of the Declaration of Maritime Labour Compliance for the Vessel and the Charterers shall be responsible for ensuring compliance with the following requirements of MLC as applicable to the Vessel and as they may apply to the Charterers' Personnel:

   (i) Minimum age;

   (ii) Medical certificate;

   (iii) Training and qualifications;

   (iv) Recruitment and placement;

   (v) Employment agreements;

   (vi) Wages;

   (vii) Hours of work and rest;

   (viii) Entitlement to leave;

   (ix) Repatriation;

   (x) Compensation for the Vessel's loss or foundering;

   (xi) Liability for sickness, injury and death; and

   (xii) Health and safety protection and accident prevention, to the extent that these are under the Charterers' control.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(b)    Prior to any Charterers' Personnel boarding the Vessel and upon Owners' request at any time thereafter, the Charterers shall provide written evidence, to the reasonable satisfaction of the Owners, of the Charterers' compliance with their obligations under this Clause.

(c)    Without prejudice to Subclause 14(b) (Liabilities and Indemnities – Excluded losses), the Charterers shall indemnify, protect, defend and hold harmless the Owners from any and all claims, costs, expenses, actions, proceedings, suits, demands, and liabilities whatsoever arising out of or in connection with the Charterers' failure to meet any of their obligations under this Clause, and the Vessel shall remain on hire in respect of any time lost as a result thereof.

**30.    BIMCO Sanctions Clause for Time Charter Parties**

(a)    The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgement of the Owners, will expose the Vessel, Owners, managers, Crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organisation.

(b)    If such sanction or prohibition applies to the project or the Area of Operations that the Charterers intend the Vessel for, or the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be entitled to terminate the Charter Party.

(b)    If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Subclause 30(b) anything is done or not done, such shall not be deemed a deviation.

(c)    The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of bills of lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Subclause 30(b).

(d)    The Charterers shall ensure that this Clause shall be incorporated into all sub-charters and bills of lading issued pursuant to this Charter Party.

**31.    BIMCO Designated Entities Clause for Charter Parties**

(a)    The provisions of this Clause shall apply in relation to any sanction, prohibition or restriction imposed on any specified persons, entities or bodies including the designation of specified vessels or fleets under United Nations Resolutions or trade or economic sanctions, laws or regulations of the European Union or the United States of America.

(b)    Owners and Charterers respectively warrant for themselves (and in the case of any sublet, Charterers further warrant in respect of any sub-charterers, shippers, receivers, or cargo interests) that at the date of this fixture and throughout the duration of this Charter Party they are not subject to any of the sanctions, prohibitions, restrictions or designation referred to in Subclause 31(a) which prohibit or render unlawful any performance under this Charter Party or any sublet or any bills of lading. Owners further warrant that the nominated vessel, or any substitute, is not a designated vessel.

(c)    If at any time during the performance of this Charter Party either party becomes aware that the other party is in breach of warranty as aforesaid, the party not in breach shall comply with the laws and regulations of any Government to which that party or the Vessel is subject, and follow any orders or directions which may be given by any body acting with powers to compel compliance, including where applicable the Owners' flag state. In the absence of any such orders, directions, laws or regulations, the party not in breach may, in its option, terminate

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

the Charter Party forthwith or, if cargo is on board, direct the Vessel to any safe port of that party's choice and there discharge the cargo or part thereof.

(d) If, in compliance with the provisions of this Clause, anything is done or is not done, such shall not be deemed a deviation but shall be considered due fulfilment of this Charter Party.

(e) Notwithstanding anything in this Clause to the contrary, Owners or Charterers shall not be required to do anything which constitutes a violation of the laws and regulations of any State to which either of them is subject.

(f) Owners or Charterers shall be liable to indemnify the other party against any and all claims, losses, damage, costs and fines whatsoever suffered by the other party resulting from any breach of warranty as aforesaid.

(g) Charterers shall ensure that this Clause is incorporated into all sub-charters, contracts of carriage and bills of lading issued pursuant to this Charter Party.

**32.    Taxes**

The Owners shall be responsible for the taxes stated in Box 31 and ~~which Owners are liable for as imposed by any appropriate government authority, which are properly chargeable upon the Owners and their Employees relating to this Charter Party.~~ the The Charterers shall be responsible for all other~~all other~~ taxes applicable to the Area of Operations and/or Charterers' use of the Vessel, including but not limited to transportation, use, sale ad valorem, stamp, value added, environmental or emission taxes and all local taxes (including any education tax or social tax). Should Charterers be required to withhold taxes from Charter hire or from other payments due to Owners, Charterers shall be permitted to withhold such taxes provided that Charterers shall promptly deliver to Owners evidence satisfactory to the Owners, acting reasonably, that the taxes or charges in respect of which such deduction or withholding was made have been remitted to the appropriate taxation authority.

In the event of a change in local regulation ~~at the Area of Operation~~ and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, hire shall be adjusted accordingly. Charterers shall indemnify and hold Owners harmless for any taxes arising out of this Charter Party for which the Charterers are liable under this section during the term of the Charter Party or as may be later assessed by any relevant tax authority.

**33.    Lay-up**

The Charterers shall at any time during the Charter Period have the option to require the Owners to place the Vessel in lay-up in accordance with the following process:

(a) The Charterers shall notify the Owners in writing of their intention to lay-up the Vessel including a date for the commencement of the lay-up and its estimated duration. The Charterers shall nominate a safe port or place where the Vessel shall be laid up.

(b) The Owners shall within seven days, provide the following responses in writing to the Charterers:

(i) the Owners' approval, which shall not be unreasonably withheld or delayed, of the nominated port or place of lay-up, or, if not approved, provide an alternative port or place;

(ii) the Owners' description and justification of the nature and extent of the lay-up;

(iii) the Owners' reasonable estimate of costs to place the Vessel in lay-up and the time required;

(iv) the Owners' reasonable daily savings during the period the Vessel is in lay-up and the amount of reduced hire during the period of lay-up; and

(v) the Owners' reasonable estimate of costs to reactivate the Vessel at the end of the period in lay-up and the time required.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(c)    Upon receipt of the information in Subclause 33(b) above, the Charterers shall, within seven (7) days, confirm to the Owners if they require the Vessel to be laid-up. The Owners shall, upon receipt of the confirmation by and orders from the Charterers to lay-up the Vessel, take all actions necessary to effect the laying-up of the Vessel.

(d)    The Vessel's hire rate shall be reduced to the amount specified by the Owners in Subclause 33(b)(iv), from the date the Vessel is in the port or place agreed and commences to effect lay-up. The Charterers shall pay the reasonably incurred costs of laying-up of and of reactivating the Vessel.

(e)    The Charterers shall give the Owners no less than thirty (30) days prior written notice when they require the Vessel to be reactivated and ready in all respects to accept the Charterers' voyage instructions. The Vessel's hire rate shall revert to the hire specified in Box 20(i) thirty (30) days following receipt by the Owners of the reactivation notice, or once the Vessel is again fully operational and able to comply with the Charterers' voyage instructions, whichever is the earlier.

(f)    Should the Vessel continue to be in lay-up on the date of expiry, or earlier termination of this Charter Party, the Charterers shall pay the Owners:

(i) ~~a lump sum equal to thirty (30) days Charter hire at the reduced charter rate;~~ [Not used]

(ii) the amount specified in Subclause 33(b)(v);

(iii) a demobilisation fee for the Vessel, equal to the time and costs necessary for the Vessel to transit from its port or place of lay-up to its port or place of redelivery under this Charter Party; and

(iv) any other amounts due to the Owners under this Charter Party.

(g)    Any of the Owners' obligations under this Charter Party that cannot be complied with as a direct result of the Vessel being laid-up shall be suspended, but only for the duration of the period that the Vessel is in lay-up.

(h)    ~~During any period the Vessel is in lay-up, the right to earn Maintenance Days under Subclause 13(c) shall be suspended but without effect to any such Maintenance Days already accumulated.~~

**34.    Early Termination**

(a)    At Charterers' convenience

The Charterers may terminate this Charter Party at any time by giving the Owners written notice of termination as stated in Box 14, upon expiry of which, this Charter Party will terminate. Upon such termination, Charterers shall pay the compensation for early termination stated in Box 13(ii) and the demobilisation fee stated in Box 15, as well as hire or other payments due under the Charter Party up to the time of termination. If Box 13(i) is left blank, this Clause 34(a) shall not apply.

(b)    For cause

If any of the events listed in subclauses (i)-(vi) ("Termination Event") occur, either party in respect of the events listed in subclauses (i), (ii), (iv) and (v), and the non-defaulting party in respect of the events listed in subclauses (iii) and (vi), may give written notice of its intention to terminate this Charter Party unless the Termination Event is remedied within ~~fourteen (14)~~ seven (7) days of receipt of the notice by the other party. If the Termination Event has not been so remedied then the notifying party may terminate this Charter Party with immediate effect upon giving written notice of termination latest within three (3) days of expiry of the ~~14~~ 7 days' notice.

(i) Requisition

If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.

(ii) Confiscation

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period (other than by way of arrest for the purpose of obtaining security).

(iii) Bankruptcy

If either party has a petition presented for its winding up or administration or any other action is taken with a view to its winding up (otherwise than for the purpose of solvent reconstruction or amalgamation), or becomes bankrupt or commits an act of bankruptcy, or makes any arrangement or composition for the benefit of creditors, or has a receiver or manager or administrative receiver or administrator or liquidator appointed in respect of any of its assets, or suspends payments, or anything analogous to any of the foregoing under the law of any jurisdiction happens to it, or ceases or threatens to cease to carry on business, without prejudice to the accrued rights of that party.

(iv) Loss of Vessel

If the Vessel is lost or becomes a constructive total loss, or is missing. In the case of termination, hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of hire shall cease from the date the Vessel was last reported.

(v) Force Majeure

If a force majeure condition as defined in Clause 35 (Force Majeure) prevents or hinders the performance of the Charter.

(vi) Insurance

If the Owners have not procured the insurance policies in accordance with Clause 17 (Insurance) on delivery or any such insurance policies lapse during the Charter Period.

Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for hire and any other payments due up to the date of termination.

(c)    Repudiatory Breach
       If either party is in repudiatory breach of its obligations under this Charter party, the other party shall have the right to terminate this Charter Party with immediate effect by giving notice in accordance with Clause 38 (Notices) without prejudice to any other rights which the terminating party may have under this Charter Party.

(d)    Off-hire – In the event the Vessel is off-hire under this Charter Party due to events stated in Subclause 13(a) (Off-hire – Off-hire and exceptions) for:

       (i) a single consecutive period which exceeds that stated in Box 32(i) including any extensions which have been declared; or

       (ii) combined periods which exceed that stated in Box 32(ii) in aggregate including any extensions which have been declared,

       and the Owners have not provided a substitute vessel pursuant to Clause 21 (Substitute Vessel) within a reasonable period, this Charter Party may be terminated by the Charterers by giving notice in accordance with Clause 38 (Notices) without prejudice to any other rights which either party may have under this Charter Party.

**35.    Force Majeure**

       Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent the party invoking force majeure is prevented or hindered from performing any or all of

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

their obligations under this Charter Party, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:

(a)    acts of God;

(b)    any government requisition, control, intervention, requirement or interference;

(c)    any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;

(d)    riots, civil commotion, blockades or embargoes;

(e)    earthquakes, landslides, floods or other extraordinary weather conditions, but excluding rains, winds, seas, currents, hurricanes and named storms;

(f)    strikes, lockouts or other industrial action, unless limited to the Employees of the party seeking to invoke force majeure;

(g)    fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure;

(h)    any other similar cause beyond the reasonable control of either party.

The party seeking to invoke force majeure shall notify the other party in writing within five (5) days of the occurrence of any such event/condition.

(i)    Not used~~Notwithstanding anything to the contrary contained within the Charter Party, no payments of whatever nature, including Hire, shall be payable by the Charterer to the Owner in respect of any time lost due to a force majeure occurrence~~.

**36.    Confidentiality**

All information or data provided or obtained in connection with the performance of this Charter Party is and shall remain confidential and not be disclosed without the prior written consent of the other party, provided however that each party may disclose confidential information to its Affiliates, subcontractors, and its/their respective auditors and Employees to the extent required for the performance of this Charter Party or for legal or compliance purposes. The Parties shall use their best efforts to ensure that such information shall not be disclosed to any third party by any of their Affiliates, sub-contractors, Employees and agents. This Clause shall not apply to any information or data that has already been published or is in the public domain. All information and data provided by a party is and shall remain the property of that party.

**37.    BIMCO Dispute Resolution Clause 2016**

(a)  *  ~~This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.~~

~~The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.~~

~~The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of the sole arbitrator shall be binding on both Parties as if he had been~~

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

appointed by agreement.

Nothing herein shall prevent the Parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the Parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) *   This Charter Party shall be governed by U.S. maritime law or, if this Charter Party is not a maritime contract under U.S. law, by the laws of the State of ~~New York~~Texas, excluding its conflicts of law provisions. Any dispute arising out of or in connection with this Charter Party shall be litigated in the United States District Court for the Southern District of Texas (Houston Division)~~referred to three (3) persons at New York, one to be appointed by each of the Parties hereto, and the third by the two so chosen. The decision of the arbitrators or any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the SMA Rules current as of the date of this Charter Party~~.

~~In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the Parties may agree) the arbitration shall be conducted in accordance with the SMA Rules for~~ Shortened ~~Arbitration Procedure current as of the date of this Charter Party.~~

(c) *   ~~This Charter Party shall be governed by and construed in accordance with Singapore**/English** law.~~

~~Any dispute arising out of or in connection with this Charter Party, including any question regarding its existence, validity or termination shall be referred to and finally resolved by arbitration in Singapore in accordance with the Singapore International Arbitration Act (Chapter 143A) and any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.~~

~~The arbitration shall be conducted in accordance with the Arbitration Rules of the Singapore Chamber of Maritime Arbitration (SCMA) current at the time when the arbitration proceedings are commenced.~~

~~The reference to arbitration of disputes under this Clause shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator and give notice that it has done so within fourteen (14) calendar days of that notice and stating that it will appoint its own arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party does not give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both Parties as if he had been appointed by agreement.~~

~~Nothing herein shall prevent the Parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.~~

~~In cases where neither the claim nor any counterclaim exceeds the sum of USD 75,000 (or such other sum as the Parties may agree) the arbitration shall be conducted before a single arbitrator in accordance with the SCMA Small Claims Procedure current at the time when the arbitration proceedings are commenced.~~

**Delete whichever does not apply. If neither or both are deleted, then English law shall apply by default.

(d) *   ~~This Charter Party shall be governed by and construed in accordance with the laws of the place mutually agreed by the Parties and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~

(e)     The Parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Charter Party. In the case of any dispute in respect of which arbitration has been commenced under Subclause 37(a), 37(c) or 37(d), the following shall apply:

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within fourteen (14) calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the Parties shall thereafter agree a mediator within a further fourteen (14) calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the Parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the Parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either Party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each Party shall bear its own costs incurred in the mediation and the Parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

(Note: The Parties should be aware that the mediation process may not necessarily interrupt time limits.)

*Subclauses 37(a), 37(b), 37(c) and 37(d) are alternatives; indicate alternative agreed in Box 33.

If Box 33 in PART I is not appropriately filled in, subclause (a) of this Clause shall apply. Subclause 37(e) shall apply in all cases except for alternative 37(b).

**38.    Notices**

Either party giving notice under this Charter Party shall ensure that it is effectively given and such notice shall be treated as received during the recipients' office hours. If such notice is sent outside the recipients' office hours it shall be treated as received during the recipients' next working day. For the purpose of giving notices the Owners' contact details are stated in Box 2 and the Charterers' contact details are stated in Box 3.

**39.    Headings**

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

**40.    Severance**

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

If by reason of any enactment or judgment any provision of this Charter Party shall be deemed or held to be illegal, void or unenforceable in whole or in part, all other provisions of this Charter Party shall be unaffected thereby and shall remain in full force and effect.

**41.    Entire Agreement**

This Charter Party, including all Annexes referenced herein and attached hereto, is the entire agreement of the Parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both Parties.

**42.    Singular/Plural**

The singular includes the plural and vice versa as the context admits or requires.

**43.    Compliance with specific laws**

No Party shall act in any way that gives or may give rise to a liability under, violates or may violate any laws, regulations and/or other legally binding requirements or determinations in relation to bribery, corruption, fraud, money-laundering, terrorism, sanctions, collusion or anti-trust, human rights violations (including slavery, servitude, forced or compulsory labour and human trafficking), use of Conflict Minerals or similar activities which are applicable to either Party or to any jurisdiction in which any work under this Charter Party is performed and which shall include (without limitation): (i) the United Kingdom Bribery Act 2010, (ii) the United Kingdom Modern Slavery Act 2015, (iii) the United States Foreign Corrupt Practices Act 1977, (iv) any related enabling legislation pursuant to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions and (v) any United States, United Nations, Canadian or European Union sanctions. For these purposes "Conflict Minerals" means gold, tin, tantalum, tungsten and their derivatives, as well as any other mineral or mineral derivative determined by the U.S. Secretary of State or the European Union to be involved in the financing of the conflict in the Democratic Republic of Congo (DRC) or an adjoining country. No Hire shall be payable at time in the event the Owners are in breach of this Clause 43.  Each Party shall have an automatic right to terminate the Charter Party in the event of a breach of this Clause 43 and each Party shall save, indemnify, defend and hold harmless the other Party from and against all costs, losses, claims, liabilities, damages, and expenses arising from or in connection with the breaching Party of this Clause 43.

Charterers and Owners represent, warrant and guarantee that during the terms of this Charter Party, the Vessel will not navigate in the territorial waters of any country subject to U.S., UK, or EU sanctions (currently including the Crimea and Dombas regions of Ukraine, Iran, Cuba, North Korea, or Syria) or to any other country subject to sanctions where navigation to such would be prohibited without applicable government approval, including Russia.

**44.    Owners' Personnel Availability**

Owners shall make personnel available for the provision of vessel documentation, attendance to End Client meetings with Charterers, provision of onshore support and personnel attendance as required.

**45.    Compliance with Government Requirements**

Owners shall comply with all governmental and local legislative authority requirements while performing at work site and will indemnify Charterers against any claims arising out of this Charter Party which relate to any breach of applicable laws of the land by Owners, except where Owners' breach was the result of Charterers' actions.

**46.    Vessel Endurance**

Vessel endurance, including the stocking of food, water, potable water, fuel, waste, etc. shall be a full 35 days and include additional capacity for avoiding cyclones.

**47.    OVID Audit**

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

In the event the Vessel does not have a valid OVID at delivery, an OVID Audit of the Vessel will be carried out by Charterers (or by End Client) and subsequent Audit actions shall be addressed as necessary to the mutual satisfaction of Owners and Charterers, at Owners' account before the vessel can be on hire.

**48.** **Vessel Crew Composition**

The Daily Hire is inclusive of the necessary crew for 24hr DP operations.  The daily fee stated in Box 27 of Part I is inclusive of caterer and steward for 20 passengers.

**49.** **Vessel Manning, Additional Local Crews, and Crew Changes**

Owners shall provide vessel crew as required by Flag State and for 24-hour DP operations. In the event that operational geography, support service, Charterers and/or port state regulations require manning scales other than those required by the vessel's Flag State, the cost of supplemental manning and associated expenses shall be to Charterers' account.  The Owners will perform scheduled crew change every 35 days which will be pre-planned and notified in writing to the Charterers 24 hours prior to crew change. The Owners shall exert reasonable efforts to minimize disruption to the Services by ensuring that the Vessel and Charterers crews changes take place at mutually agreed dates and times.

The Charter hire rate is net to the Owners and does not include overtime, but does include crew travel to and from the nearest available suitable airport or heliport (the "Airport") on regularly scheduled crew change rotation days to coincide with Owners' schedule of fixed 35 day intervals.  Delays in crew changes, including crew change overlap in excess of twenty-four (24) hours (the complete crew change cycle must be completed during the same twenty four (24) hour period from the time at which the on-coming crew reports to the Airport until the off-going crew is disembarked at the Airport), will be charged at the full daily rate or pro ration part thereof in addition to the regular daily rate.

The Charterers shall be responsible for the cost and arrangement of the transport from the Airport to the Vessel's offshore location for the joining crew until their arrival on board the Vessel.  The cost and arrangement for any crew leaving the Vessel from the Vessel's offshore location shall be for the account of the Charterers until the crews arrival ashore at the Airport from which point the Owners shall again become responsible for all repatriation arrangements and costs.

**50.** **Communication  Requirements**

1 dedicated Sat Phone line for End Client (VSat voice and fax, minimum 9600 baud), the cost of which shall be to Charterers' at Owners' cost plus 10%.
Owners to confirm additional satellite communications that can be provided to Charterers.

The Vessel's VSAT system utilizes a base bandwidth speed of 768 Kbps (Download) x 256  Kbps (Upload).  The Vessel's base bandwidth is shared and prioritized for voice calls, vessel operations, client and crew.  Higher bandwidth speeds  or dedicated bandwidth for Charterers' sole use, may be provided at Charterers' written request, subject to availability, and will be charged at Owner's cost plus 10%.

**51.** **Vessel Trials and Certifications**

Owners will collaborate with Charterers to minimize the impact of periodic Vessel trials or certifications on Charterers' operations.

**52.** **Training & Certification Requirements**

~~Time lost due to non-compliance with the requirements below will be to Owners' account.~~Owners shall provide the following information as may be requested by Charterers:

**a)**      **Training Matrix** – Evidence of the training referenced in Charterers' Marine Operations Training Requirements Matrix in ANNEX "D" shall be sent to Charterers' Vice President of Human Resources at

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

PART II
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

tammy.jenkins@benthic.com  no later than one week prior to Vessel delivery.  All records will be filed by Charterers' Human Resources Department and treated confidentially.

**b)        Inoculations and Medication –** Charterers will communicate End Client's vaccination and preventive medication requirements to Owners prior to delivery of the Vessel.  It is Owners responsibility to verify with appropriate resources (e.g. websites, personal/travel doctor, consulate) the local vaccination and preventive medication requirements (e.g. antimalarial) for the regions where the vessel will be calling ports and operating, and to ensure that Owners' crew members comply with such local and End Client requirements prior to travelling to the Vessel delivery location.

**c)        Medical Advice Form –** The Medical Advice Form enclosed as ANNEX "E" shall be completed by each crew member.  The Medic will review this form in the event treatment is required.  All forms shall be sent to Charterers' Vice President of Human Resources at tammy.jenkins@benthic.com  no later than one week prior to Vessel delivery.  All completed forms will be filed by Charterers' Human Resources Department and the Medic and will be treated confidentially.

**d)        Drug and Alcohol Random Program –** Evidence that the Vessel crew has, over the past 6 months, been subject to a Drug and Alcohol Random Program must be sent to Charterers' Vice President of Human Resources at tammy.jenkins@benthic.com within 30 days after of Vessel delivery.  All records will be filed by Charterers' Human Resource Department and treated confidentially.

**53.    Additional Rates**

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████

███████████████████████████████████████████████     ▬

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████

████████████████████████████████████████████████

54.    Offshore Transportation - Charterers are responsible for offshore transportation for Owners' employees, vendors, contractors, subcontractors, spares and consumables including but not limited to groceries, waste, and other necessaries, to and from the Vessel as required by Owner to fulfill its charter requirements.

55.    Notwithstanding anything to the contrary contained herein, downtime or suspension of Charter hire as a result of downtime shall not apply to the repair, maintenance and/or breakdown of the HiPAP.

56.    Not used.

57.    Financial Security – simultaneous with the execution by Charterers of this Charter Party, Charterers shall deliver to Owners a Guarantee from ACTEON GROUP LTD, in the form of Annex F.  The foregoing obligation shall be a material obligation of this Charter Party and Charterers' failure to provide and maintain such a Guarantee shall be deemed to be a material breach of this Charter Party.

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

**ANNEX A to Time Charter Party for Offshore Support Vessels**
**Code name: SUPPLYTIME 2017**

**VESSEL SPECIFICATION – SEE ATTACHED**

Copyright © 2017 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this **BIMCO SmartCon** document will constitute an infringement of BIMCO's copyright. For Explanatory Notes visit www.bimco.org. First published in 1975, revised in 1989, 2005 and 2017. V1.2.



# HOS STRONGLINE
## 370MPSV Multi-Purpose Service Vessel



## DIMENSIONS AND REGULATORY INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| **Length:** | 381 ft 4 in (116.2 m) | **Beam:** | 72 ft 0 in (21.9 m) | **Draft Max:** | 19 ft 1 in (5.82 m) |
| **Gross:** | 5,984 GT | **Net:** | 3,094 NT | **Draft Min:** | 11 ft 6 in (3.51 m) |
| **IMO:** | 9040534 | **O.N.:** | 988333 | **Flag:** | U.S. |

**Certifications:** Oceans-SOLAS, USCG Subchapter D/O, USCG Subchapter I/L
**Classifications:** Loadline, ABS, +DPS-2, (E), +A1, FFV 1-NS, OSR-C1, +AMS, ACC, ESP, Fuel Oil Carrier/Oil Carrier/Chemical Carrier/OSV, CRC, ACP

## PERFORMANCE

| | | | | | |
|---|---|---|---|---|---|
| **Cruise Speed:** | 8 kts | 190 gal/hr (719 l/hr) | **Max Speed:** | 10 kts | 280 gal/hr (1,060 l/hr) |
| **On DP:** | | 105 gal/hr (397 l/hr) | **On Standby:** | | 60 gal/hr (227 l/hr) |

## PROPULSION, MACHINERY AND STEERING

| | | | |
|---|---|---|---|
| **Primary Generators:** | 4 x Caterpillar 3516C | **Total Rating:** | 8,400 kW |
| **Auxiliary Generators:** | 3 x Caterpillar C 18 | **Total Rating:** | 1,275 kW |
| **Fwd Bow Thruster:** | 1 x Rolls Royce Marine CPP Tunnel | **Total Rating:** | 1,500 hp |
| **Aft Bow Thruster:** | 2 x Rolls Royce Marine CPP Drop Down Azimuth | **Total Rating:** | 3,000 hp |
| **Stern Thruster:** | 1 x Rolls Royce Marine CPP Tunnel | **Total Rating:** | 1,500 hp |
| **Main Propulsion:** | 2 x Rolls Royce Marine FPP Steerable | **Total Rating:** | 6,000 hp |
| | | **Power Generation:** | 480V/60 Hz/3P, 600V/60 Hz/3P |

## CAPACITIES AND DELIVERY RATES

| | | | |
|---|---|---|---|
| **Deadweight (Sub L):** | 7,869 LT (7,995 MT) | **Deck Area:** | 155 ft x 58 ft (8,875 ft²) |
| **Deadweight (Sub I):** | 6,555 LT (6,660 MT) | | 47.2 m x 17.7 m (824.5 m²) |
| **Deadweight (Sub D/O):** | 4,864 LT (4,942 MT) | | |
| **Deck Cargo:** | 4,690 LT (4,765 MT) | **Deck Load Rating:** | 1,024 lbs/ft² (5 MT/m²) |
| **Dry Bulk:** | 6,240 ft³ (177 m³) | **System Pressure:** | 80 psi (5.5 bar) |
| **Brine:** | 30,961 bbl (4,922 m³) | **Discharge Rate:** | 1,000 GPM (227 m³/hr) |
| **Cargo Oil (D/O):** | 24,547 bbl (3,902 m³) | **Discharge Rate:** | 1,000 GPM (227 m³/hr) |
| **Fresh Water:** | 64,979 gal (246 m³) | **Watermaker Cap.:** | 5,000 USG/day (19 m³/day) |
| **Liquid Mud:** | 30,961 bbl (4,922 m³) | **Discharge Rate:** | 1,000 GPM (227 m³/hr) |
| **Rig Fuel (I/L):** | 36,274 bbl (5,766 m³) | **Discharge Rate:** | 1,000 GPM (227 m³/hr) |
| **Rig Water:** | 32,210 bbl (5,120 m³) | **Discharge Rate:** | 750 GPM (170 m³/hr) |
| **Cooler Area:** | 850 ft³ (24 m³) | **Freezer Area:** | 850 ft³ (24 m³) |

## ELECTRONICS

Auto Pilot, CCTV Cameras, Cyscan, Depth Sounder, DGPS, EPIRB, Gyro Compass, Joystick Control, Wartsila NMS 6000, Mag Compass, MAMS/VMS, Navtex, Public Phone System w/ loudhailer, Radar (S-band), SARTs, VHF Radio, VHF Radio (Handheld), Windbird, X-band Radar, VSAT

## ACCOMMODATIONS

20 air conditioned/heated staterooms for 52 person(s) berthing total. The rooms are configured as follows:

*2 air-conditioned staterooms for 1 person(s) berthing each.*      *10 air-conditioned staterooms for 2 person(s) berthing each.*
*2 air-conditioned staterooms for 3 person(s) berthing each.*      *6 air-conditioned staterooms for 4 person(s) berthing each.*

Accommodations include: Client Office, Lounge

## SPECIAL FEATURES

| | | | |
|---|---|---|---|
| **Oil Spill Recovery:** | ABS Capability Class 1 | **Recovered Oil Capacity:** | 24,547 bbl (3,902 m³) (<60 °C FP) |
| **Off-ship Firefighting:** | ABS FiFi 1 | **Number of Fire Monitors:** | 2 |
| | | **Total Flow Rate:** | 10,560 gal/min (2,400 m³/hr) |
| **Crane:** | 3 x Hydra Pro HP70/20T | **Max Lift @ Max Radius:** | 2 MT @ 70 ft |
| | | **Max Lift @ Min Radius:** | 20 MT @ 10 ft |
| **Roll Damping:** | Anti-Roll Tank, Passive | | |
| **Fast Rescue Craft:** | 1 x 15 Person(s) | | |

NOTICE: The information contained herein is provided solely for the convenience of reference, and Hornbeck does not warrant the accuracy or completeness of the data, which may vary from the current condition of the vessel or equipment. Hornbeck accepts no liability for the content of this document or for the consequences of any actions taken on the basis of the information provided, unless that information is subsequently confirmed in writing by an authorized representative.

| | | |
|---|---|---|
| 103 Northpark Blvd., Suite 300 | **Hornbeck Offshore** | Phone:  (985)727-2000 |
| Covington, Louisiana 70433 | | Fax:  (985)727-3606 |
| Rev. 16 | http://www.hornbeckoffshore.com | Date:  10/12/2022 |

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

**ANNEX B to Time Charter Party for Offshore
Support Vessels**

**Code name: SUPPLYTIME 2017**

**INSURANCE**

Insurance policies (as applicable) to be obtained and maintained by the Owners under Clause 17 (Insurance):

(1) <u>Marine Hull Insurance</u>

Hull and Machinery Insurance shall be provided with limits equal to the ~~total~~ <u>agreed</u> value of the Vessel.

(2) <u>Protection and Indemnity (Marine Liability) Insurance</u>

Protection and Indemnity (P&I) or Marine Liability Insurance for the Vessel. The insurance, which shall be effected with a member of the International Group of P&I Clubs, or comparable insurers, shall have a coverage up to the maximum limit available for the Vessel, including debris and wreck removal and oil pollution. The insurance shall include coverage for specialist operations or e███████████████████████  The cover shall include liability for collision and damage to fixed and floating objects to the extent not covered by the insurance in (1) above.  The End Client shall be named as an additional insured or co-insured Party.

(3) <u>General Third-Party Liability Insurance / Comprehensive General Liability Insurance</u>

To the extent not covered by the insurance in (2) ABOVE, Coverage shall be for:

• ████████████████████████████████████████
████████████████████████████████████

(4) <u>Workmen's Compensation and Employer's Liability Insurance for Employees</u>

To the extent not covered in the insurance in (2) above, covering Owners' employees and other persons for whom Owners are liable as employer pursuant to applicable law for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.  Such insurance shall cover losses connected with illness, personal injury or accidental death in Owners' Group, to the extent required by applicable laws.

(5) <u>Comprehensive General Automobile Liability Insurance</u>

• Not applicable.

(6) <u>Such other insurances as may be agreed.</u>

(7) The policies shall state that the insurers waive all rights of subrogation against Charterers' Group (as defined in Article 14 of the Charter Party) to the extent of Owners' indemnities under the Charter Party.

(8) Owners shall ensure that Charterers' Group is named as additional insured under the insurances listed in 1), 2), 3), 5) and 6) in connection with the performance of the Charter Party, and be primary as to all other policies, only to the extent it relates to claims which Owners are obliged to indemnify under the Charter Party.

(9) It is further expressly agreed that Owners' insurance shall apply to Owners' indemnity and defense obligations under this Charter Party.

(10) Owners shall notify Charterers with at least a thirty (30) days prior written notice before the insurance is cancelled, materially changed or expires for any other reason.

(11) Owners shall, at the request of Charterers, produce certified copies of insurance certificates with the necessary information, including the expiry date, relating to all insurances taken out by Owners in accordance with this ANNEX "B".

(12) If Owners fails to take out insurance according to its obligations of this ANNEX "B", then Charterers are entitled to take out such insurance and claim a refund of the costs from the Owners.

(13) The parties further agree that the minimum insurance requirements as set forth above shall not limit or waive a party's legal or contractual responsibilities to the other party or others.

**PART II**
**SUPPLYTIME 2017 Time Charter Party for Offshore Support Vessels**

CONTINUED ANNEX B to Time Charter Party for Offshore Supply Vessels  Code Name:
SUPPLYTIME 2017

**INSURANCE REQUIREMENTS**
**(CHARTERERS)**

Insurance policies (as applicable) to be procured and maintained by the Charterers under Clause 17:

I.      **General Policy Provisions** (Applicable to All Policies)

All policies of insurance to be provided by CHARTERERS will contain:

1)      Additional Insured endorsement naming OWNERS to the extent of risks and liabilities assumed (excluding Worker's Compensation; OWNERS to be designated as alternative employers on the required Worker's Compensation  coverage, to the extent of risks and liabilities assumed by CHARTERERS).
2)      Waiver of Subrogation endorsement in favor of OWNERS to the extent of risks and liabilities assumed.
3)      Endorsement designating all insurance provided by CHARTERERS to be primary to any other insurance maintained by  OWNERS.
4)      30 day notice of cancellation or material change.
5)      Territorial and/or navigational limits sufficiently broad to address all operations contemplated under contract.
6)      Certificates of Insurance evidencing compliance with all coverage requirements.
7)      Watercraft exclusion deleted

II.     **Worker's Compensation/Employer's Liability**

1)      Statutory Worker's Compensation for State of hire/operations
2)      Employer's Liability with minimum █████████████
3)      Other States endorsement
4)      Alternate Employer/Borrowed Servant endorsements
5)      United States Longshore & Harbor Worker's Compensation Act coverage.
6)      Outer Continental Shelf Lands Act endorsement
7)      Gulf of Mexico Territorial extension
8)      Voluntary Compensation
9)      Maritime Employer's Liability coverage with a minimum limit of $1,000,000 including transportation, wages,  maintenance and cure, Jones Act and Death on the High Seas Act.
10)     "In Rem" endorsement

III.    **General Liability**

1)      Premises/Operations including bodily injury, property damage, and personal injury.
2)      Products/Completed Operations
3)      Blanket Contractual Liability
4)      Blowout and Cratering*
5)      Explosion, Collapse and Underground Property Damage*
6)      Sudden & Accidental Pollution*
7)      Watercraft Exclusion deleted or sufficiently modified to address all vessel operations contemplated under contract.
8)      "In Rem" endorsement
9)      Minimum Limit of █████████████

IV.     **CONTRACTOR'S EQUIPMENT & PROPERTY** (Note: This insurance is required only in the event that the Charterer is  engaged in construction activities)

1)      All Risk Policy form including transit for all equipment owned, leased, rented, borrowed, or in CHARTERER's  care,  custody or control for which they are legally responsible
2)      Insured Value Replacement cost or Fair Market Value
3)      Waiver of coinsurance requirements or verification of compliance with any coinsurance provision.